Raymond E. Morrow and Maxine Morrow, et al. [1] v. Commissioner. Morrow v. Commissioner
Docket Nos. 3740-62 - 3742-62, 3744-62. .
United States Tax Court
T.C. Memo 1965-45; 1965 Tax Ct. Memo LEXIS 283; 24 T.C.M. (CCH) 239; T.C.M. (RIA) 65045; March 4, 1965
*283 Spurgeon Avakian and Robert D. Platt, 833 First Western Bldg., 1330 Broadway, Oakland, Calif., for the petitioners. David R. Brennen, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined the following deficiencies in income tax and additions to tax: Additions to Tax
Petitioners
Year
Deficiency
Sec. 294(d)(1)(A), I.R.C. 1939
Raymond E. Morrow and Maxine
Morrow, Dkt. No. 3740-62
1953
None
None
1954
$14,390.04
$1,295.06
1955
43,007.10
None
1956
2,732.50
None
Additions to Tax
Sec. 6653(b), I.R.C. 1954
Loyd A. Morrow, Dkt. No. 3741-62
1955
$26,257.86
$6,046.37
Zella E. Morrow, Dkt. No. 3742-62
1955
$26,689.84
Additions to Tax
Sec. 293(b)
Sec.
Sec. 294
I.R.C. 1939
291(a)
(d)(1)(A)
(6653(b),
I.R.C.
I.R.C.
I.R.C. 1954)
1939
1939
Loyd A. Morrow and Zella E. Mor-
row, Dkt. No. 3744-62
1949
$ 4,844.30
$ 2,422.15
$1,211.07
$ 444.81
1950
19,877.18
9,938.59
4,969.30
1,788.95
1951
5,537.75
2,768.88
1,384.44
513.15
1952
12,170.80
6,085.40
3,042.70
1,117.69
1953
2,095.36
5,142.13
2,571.07
955.11
1954
45,524.89
10,614.94
None
1,989.71
1956
13,369.93
None
None
None
1957
16,813.61
None
None
None
*284 The issues presented for decision are: 1. Are petitioners Loyd and Zella Morrow and petitioners Raymond and Maxine Morrow each entitled to a deduction of $57,341.80 in the year 1957 for their respective shares of a loss from a business bad debt of $114,683.60 claimed by the Morrow Brothers partnership in its partnership return for the fiscal year ending April 30, 1957? [2]
2. Did petitioners Loyd and Zella Morrow sustain a loss of $115,708.82 from a business bad debt in 1956, as the result of a loan of $164,000 made to Thomas G. Stone on July 27, 1955? Other issues raised by the pleadings have been settled by stipulation. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Petitioners, residents of California, filed their income tax returns for the taxable years involved with the district director of internal revenue, San Francisco, California. Loyd Morrow (hereinafter referred to as *285 Loyd) and Zella Morrow are husband and wife. Loyd was born about 1914 in Missouri. His formal education consisted of the first six grades of elementary school. He moved to California in 1942. For all of his working life through approximately 1942, he was employed in the construction business as a laborer or a carpenter. He went into business for himself in Ceres, California, in about 1943, building homes "a house at a time". The business continued until 1953. Raymond Morrow and Maxine Morrow are husband and wife. Raymond is Loyd's brother. His education continued through the first year of high school. Prior to 1953, he also engaged in the construction business. On May 1, 1953, Loyd and Raymond formed a partnership for the purpose of engaging in the residential construction business under the name of "Morrow Brothers". They were equal partners. The sole activity of the partnership was constructing houses in a tract known as Morrow Village which was located on Whitmore Road, east of Ceres, California. It constructed "around 130 or 140" houses between May 1, 1953 and the summer of 1955. It completed the last of these houses by June 30, 1955, and thereafter its only activity was the *286 selling of the houses it had constructed and the related servicing and repairing of such houses. It sold the last house on February 2, 1956 and was dissolved on November 21, 1957. It filed partnership returns of income for its fiscal years ending April 30, 1954 through April 30, 1957, and for the period May 1 to November 21, 1957. Early in 1953 Loyd became acquainted with Thomas G. Stone, a financier with an interest in the selling aspects of residential construction. Stone controlled a corporation known as S & S Homes, Inc. (hereinafter referred to as S & S Homes). Shortly after Morrow Brothers partnership commenced the construction of houses in Morrow Village, it entered into an arrangement with S & S Homes pursuant to which Morrow Brothers sold completed houses to S & S Homes, which in turn sold them to the ultimate purchasers. S & S Homes financed its purchases from Morrow Brothers in the following manner: At the time of purchase, it borrowed (from various sources) a portion of the value of the property. The purchase price would be paid out of the amount so borrowed. If the amount borrowed were not sufficient to cover the full purchase price, the balance would be paid at the *287 time that the ultimate purchaser obtained his financing. In the partnership return filed by Morrow Brothers for its taxable year ended April 30, 1954, it reported gross receipts of $482,828.32 and net profits of $101,333.37, and in the partnership return for its taxable year ended April 30, 1955, it reported gross receipts of $1,042,628.34 and net profits of $227,332.06. The receipts were from the sale of Morrow Village houses to S & S Homes pursuant to the arrangement described in the preceding paragraph. Wesley S. Suman, a certified public accountant, was the accountant for Stone and his enterprises from January 1953 to the end of 1958. Beginning in about April 1956 and ending in January of 1957, Suman was a director and secretary of S & S Homes. Through Stone he met Loyd, and in the early part of 1955 he was employed by Morrow Brothers to perform accounting services. At that time the partnership did not have a formal set of books and did not employ a bookkeeper. In May, June, or July of 1955, Suman commenced the preparation of formal books of account for the partnership, which included a "current account" relating to S & S Homes. When this "current account" was prepared, various *288 amounts were posted to it, representing amounts advanced or paid by Morrow Brothers on and after September 10, 1953, and amounts received by Morrow Brothers after that date. The account showed net advances of $134,335.79 as of June 13, 1955; $122,527.53 as of June 30, 1956, and $114,683.60 as of April 30, 1957. On the books of S & S Homes these amounts were shown as obligations of that corporation to Morrow Brothers. A copy of the portion of the books of account of Morrow Brothers relating to the "current account" was introduced in evidence as Exhibit 26-Z, consisting of four single-spaced typewritten legal-size pages. It bears the caption "Morrow Brothers - Detail of Loans to S & S Homes, Inc., September 13, 1953 to April 30, 1957". The body of the exhibit is composed of three columns. The first column, headed "Date", gives the date on which a particular alleged loan or repayment was made. The second column, headed "Payee or Description", lists the names of payees to whom payments were made or a description of the payment such as "Cash", "Sales - Morrow Village houses", "Modesto Bee", "Various fees on houses", etc. S & S Homes is not included among the names of some 40 or 50 persons *289 or corporations listed as payees of designated amounts. The third column, headed "Loans (Repayments)", sets forth the amount of each alleged loan or repayment. Included in the amounts posted to the account as "loans" to S & S Homes were the following payments: 1. $10,000 on September 10, 1953, by Morrow Brothers to Arch MacDonald, attorney for Thomas G. Stone, for the purpose of acquiring an interest in certain property in Mountain View, California. The property was never purchased and petitioners do not know what happened to the $10,000. It was not returned to Morrow Brothers. 2. $17,287.07 on December 18, 1954, by Morrow Brothers to Security Title Insurance Co. for the purpose of exercising an option to purchase a piece of land known as "Stockton Acres" in Stockton, California (35 miles from Ceres, the location of Morrow Village). When the option was exercised the land was acquired in the name of Morrow Development Company (the stock of which was held equally by Loyd A. Morrow and Thomas G. Stone). The land was developed by Morrow Development Company and houses and apartments were constructed on a portion of it. 3. $20,000 on April 16, 1954, by Morrow Brothers to Stone to *290 enable Stone to purchase and sell some houses in Redding, California. Morrow Brothers was to receive 50 percent of the profits for advancing the $20,000 and Stone the remaining 50 percent for selling the houses. Nothing was said about losses in the event the venture was unsuccessful. Stone did not get title to the houses. The $20,000 was not returned to Morrow Brothers. Also posted to the account as "loans" to S & S Homes were the amounts of $1,923.00 and $15,517.37. The entries in the account relating to them were as follows: 12-31-55 To consolidate and settle intercompany accounts: [3]
Due From
Due To
National Homes, Inc.
Morrow Bros.
$ 7,804.55
Stone & Miles, Inc.
Morrow Bros.
235.77
Nueva Vista Homes, Inc.
T. G. Stone Enterprises, Inc.
(70.97)
Seneca Construction Co.
T. G. Stone Enterprises, Inc.
(97.21)
Seneca Construction Co.
S&S Homes, Inc.
(184.00)
Seneca Construction Co.
Overton Homes, Inc.
(5,000.00)
Sisson Contractors, Inc.
T. G. Stone Enterprises, Inc.
(302.44)
Central Mortgage Discount Corp.
S&S Homes, Inc.
(7,626.29)
T. G. Stone
Central Mortgage Discount Corp.
100.00
Morrow Construction Co.
T. G. Stone Enterprises, Inc.
(78.56)
T. G. Stone Enterprises, Inc.
K. T. Construction Co.
34,921.44
Morrow Bros.
Morrow Development Co.
(27,779.29)
$1,923.00
6-30-56 To consolidate and settle intercompany accounts: [3]
National Homes, Inc.
R-B Construction Co.
$ 663.24
Overton Homes, Inc.
R-B Construction Co.
7,850.00
National Homes, Inc.
Montforest Homes, Inc.
3,500.00
T. G. Stone
Montforest Homes, Inc.
3,733.42
National Homes, Inc.
Ceres Garden Homes, Inc.
1,500.00
T. G. Stone
Ceres Garden Homes, Inc.
3,153.22
Wayside Homes, Inc.
T. G. Stone
(3,220.46)
T. G. Stone Enterprises, Inc.
Wayside Homes, Inc.
2,000.00
Stone Garden Homes, Inc.
Seneca Construction Co.
2,348.35
Seneca Construction Co.
National Homes, Inc.
(1,200.00)
T. G. Stone Enterprises, Inc.
Sisson Contractors, Inc.
39.63
Sisson Contractors, Inc.
Stone Garden Homes, Inc.
(25.56)
Morrow Bros.
Overton Homes, Inc.
(4,500.00)
L. A. Morrow
Overton Homes, Inc.
(250.00)
KT Construction Co.
T. G. Stone Enterprises, Inc.
(5.00)
Raymond Morrow Construction Co.
T. G. Stone Enterprises, Inc.
(69.47)
$15,517.37
*291 The posting of $1,923.00 and $15,517.37 to the account as "loans" by Morrow Brothers to S & S Homes was not directed by petitioners. There were also posted to the account 15 payments totaling $86,042.25 described as "Cash" or "Cash - Loan advance" of which three, totaling $19,300, were identified by petitioners as relating to Morrow Brothers business of selling houses in Morrow Village. Payments and repayments in the net amount of $5,335.73 described as "Sales - Morrow Village houses" were also identified as relating to that business. In addition, numerous payments, including those described as "Modesto Bee", in the total amount of $7,200.29, were made by Morrow Brothers in behalf of S & S Homes for advertising and other costs relating to the Morrow Village business. In the return of Morrow Brothers partnership for the fiscal year ended April 30, 1957, it claimed a business bad debt deduction of $114,683.60, and reported a loss for that year of $117,291.03. Petitioners Loyd and Zella Morrow, and petitioners Raymond and Maxine Morrow, each claimed as a deduction in their returns for 1957, *292 as their respective shares of that loss, the amount of $58,645.52. Respondent disallowed $57,341.80 of the deduction claimed by each on the ground that the partnership was not entitled to the deduction of $114,683.60 claimed for a business bad debt in its return for the fiscal year ending April 30, 1957. The total indebtedness owed by S & S Homes to Morrow Brothers as of April 30, 1957, which was attributable to advances related to the business of Morrow Brothers made to or in behalf of S & S Homes during the period September 10, 1953 to April 30, 1957, was $40,000. This debt became worthless during the fiscal year of Morrow Brothers ending April 30, 1957. Sometime during the early part of 1955 Stone introduced Loyd to Sylvanius G. Felix, a corporation tax attorney. Felix advised Stone and Loyd that it would be to their advantage to set up their building construction and land-owning operations on a multiple corporation basis. Stone and Loyd's attorney agreed with Felix, and although Loyd knew nothing about "corporation setups" he decided to follow Felix's advice and do business in corporate form. Between April 13, 1955 and June 20, 1955, 13 corporations were formed. The stock *293 of each of these corporations was owned by one or more of three Morrow Brothers - the two male petitioners herein plus a third brother, C. H. Morrow, who was not a member of the Morrow Brothers partnership. Three additional Morrow corporations were formed on April 5, 1956, October 17, 1956, and May 9, 1957. Some of these Morrow corporations were land-owning and others building corporations. [4] Stone became the owner of the outstanding stock or was otherwise in control of about 40 corporations. [5] Most of the Stone corporations were land-owning corporations and did not engage in building operations. The stock of one corporation, Morrow Development Co., incorporated on August 18, 1954, was owned 50 percent by Loyd and 50 percent by Stone. It was regarded as part of the Stone group of corporations in certain transactions and as part of the Morrow group in others. *294 From June 1955 to 1959, petitioners operated through corporations. Three of their corporations have engaged in construction activities since 1959. Stone had been financing his many activities largely with loans from the Wells Fargo Bank and by March, 1955, he was encountering difficulty in obtaining funds from it. In the early part of March, 1955, he outlined a plan to Loyd whereby Stone would acquire control of Home Mutual Savings & Loan Association through purchase of stock therein so that he would be able "more readily" to obtain financing for their building construction operations. He proposed to borrow a substantial amount of money from Loyd for that purpose. Loyd and his wife not only executed a "Continuing Guaranty" on March 25, 1955 guaranteeing Stone's indebtedness to the Wells Fargo Bank up to $1,000,000, but on July 27, 1955 Loyd made available a total of $164,000 to Stone for the purpose of enabling Stone to carry out the foregoing plan of acquiring control of Home Mutual Savings & Loan Association. The funds making up the $164,000 had their source either in Morrow Brothers, or in corporations in which Loyd was the sole stockholder or a principal stockholder, or in *295 Loyd himself, as follows: (a) Morrow Brothers
$ 12,913.94
(b) R.B. Construction Co.
60,000.00 *
(c) K.T. Construction Co.
30,000.00 *
(d) Montforest Homes, Inc.
10,000.00
(e) Loyd A. Morrow through a
loan from Home Mutual
Savings & Loan Associa-
tion
34,000.00
(f) Central Mortgage Discount
Corporation
10,159.00
(g) Morrow Development Com-
pany
6,911.12
(h) Loyd A. Morrow
15.94
$164,000.00
The R.B. Construction Co., K.T. Construction Co., Montforest Homes, Inc., Central Mortgage Discount Corporation, and Morrow Brothers on their books showed the amounts advanced by them as advances to Loyd, and on the books of account of Loyd they were shown as advances by him to Stone. The amount of $6,911.12 advanced by the Morrow Development Company came from an escrow containing amounts due to that corporation on the sale of two houses, and was shown on the books of account of the corporation as an *296 assignment to Morrow Brothers' partnership to secure a loan from Morrow Brothers to it, on the books of account of Morrow Brothers as an advance to Loyd, and on the books of Loyd as an advance to Stone. No promissory notes were ever executed by Loyd in connection with the foregoing amounts shown on the books of the corporations referred to above. The obligations of Loyd in respect of the amounts shown on the books of R.B. Construction Co., K.T. Construction Co., Montforest Homes, Inc., and Central Mortgage Discount Corporation as loans to Loyd have been satisfied in part by various book adjustments and in part by cash payments made by Loyd. Loyd repaid the $34,000 that he borrowed from the Home Mutual Savings & Loan Association. The various advances to Stone aggregating $164,000 represented a loan by Loyd to Stone. At the time the $164,000 was paid to Stone, it was Loyd's intention to remain indefinitely in the home building and land development business; he had no specific plan or intention as to the legal form or forms he would adopt in conducting such activities for the balance of his career. From July of 1955 to 1959, petitioners engaged in home-building activities in corporate *297 form. Their activities as partners in Morrow Brothers after July of 1955 were incident to the winding up of its affairs through the sale of completed houses (presumably through S & S Homes) and the necessary servicing and repair related to such sales. They engaged in no home-building activity in an individual capacity until 1959. However in 1957 Loyd individually received a fee for a continuing guarantee to Home Mutual Savings & Loan Association in respect of a loan to Chris Miles for the purpose of developing a tract in Santa Clara County; the loan enabled Miles to build houses on the tract, and Loyd's compensation was forthcoming "at the end of the deal". Beginning in 1959 and for at least several years thereafter Loyd individually engaged in various joint ventures, one involving 37 houses in Newark, California, another involving 48 houses in San Jose, another involving 36 houses, another involving a land development project in Rockaway, another of unspecified nature in Santa Cruz, and finally one involving 38 houses and 80 acres in Scotts Valley. In January 1964, three of the corporations formed in 1955 and one in 1956 were still in existence. At that time Loyd owned stock in two *298 of these corporations, one of which, Morrow Homes, Inc., owned all the shares in two subsidiary corporations, R.B. Construction Co. and Bear Creek Homes, Inc. During the five or six years prior to January 1964 Morrow Homes, Inc. and its two subsidiaries engaged in home construction activities. At its peak, the total amount of the indebtedness of Stone and his corporations to the Wells Fargo Bank was over $10,000,000. In April of 1956, the bank became concerned about the condition of Stone's affairs. A meeting was held at the bank at which Stone's father-in-law, Ford Tussing, his attorney, John Burd, and his accountant, Wesley Suman, were present. At this meeting it was agreed that the bank would refrain from calling all of Stone's loans and itself liquidating the "Stone empire" [6] only on condition that Tussing and Suman would become officers and directors of S & S Homes and would handle an orderly liquidation. Tussing and Suman became officers of S & S Homes, and two of the three directors of that corporation. The third director was Stone who continued to be president. As officers and directors Tussing and Suman "attempted to direct the affairs of the corporation in cooperation *299 with the bank toward orderly liquidation of the entire Stone empire". Sometimes the directors had meetings two or three times a week, and Stone attended many of those meetings. On August 1, 1956, a meeting was held for the purpose of settling the complex and multifarious accounts between the Morrow group and the Stone group. As a result of this meeting, two notes were signed. One in the amount of $122,527.53, [7] dated June 30, 1956, payable to "Morrow Brothers", was signed in behalf of S & S Homes by its duly authorized president and secretary, and the other in the amount of $164,000, dated June 30, 1956, payable to "Loyd A. Morrow", was signed by Stone. Both notes were due and payable on June 30, 1959. On September 19, 1956, Stone executed a power of attorney sufficient in scope to give to Ford M. Tussing and Dudley F. Miller power to execute in his behalf "any note or notes of hand, bond or bonds, or other instruments or contracts, in my name, and on my account * * * which they may deem meet or expedient" and "to pay and discharge all debts and demands due and payable, or which *300 may hereafter become due and payable by me unto any person or persons whatsoever". Also on September 19, 1956, Loyd's attorney wrote a letter to Stone in which he stated that the notes dated June 30, 1956, referred to above, were unacceptable, and insisted upon execution of demand notes dated August 1, 1956. In response thereto, the duly authorized president and secretary of S & S Homes executed in its behalf a $122,527.53 demand note dated August 1, 1956, payable to "Loyd A. Morrow", and guaranteed by Miller and Tussing as attorneys in fact for Stone; and Miller and Tussing as attorneys in fact for Stone executed a $164,000 demand note dated August 1, 1956, payable to "Loyd A. Morrow". On September 17, 1956, a temporary restraining order was issued by the San Francisco Superior Court in connection with a divorce action which had been filed by Stone's wife. The restraining order prohibited any of the named defendants from dealing in any way with Stone's property and was issued against Stone, S & S Homes, Wells Fargo Bank, Home Mutual Savings & Loan *301 Association, and various individuals and corporations associated with the Stone empire. The effect of the restraining order was to make the liquidation efforts of Suman and Tussing at first "most difficult" and soon "impossible". In September of 1956, as a result of Stone and his corporations then being in default on amounts owed by them to the Wells Fargo Bank, the Bank took over the management of Stone's financial affairs and those of his corporations. The various obligations to the Bank were secured and it thus occupied a preferred position in respect of other creditors. Between September of 1956 and the fall of 1963, the Bank foreclosed upon, purchased at foreclosure sale, and then liquidated all of the property of Stone and of his corporations upon which it had liens. The Bank eventually, in the fall of 1963, recovered the principal of all amounts it had loaned to Stone and to his controlled corporations and also a portion of the interest thereon. The interest remaining unpaid to the Bank in the fall of 1963 was approximately $401,000 and represented the interest that would have accrued to the fall of 1963 had the Bank continued to accrue interest to such date. Of the $164,000 *302 received by Stone on July 27, 1955, the net amount of $48,291.18 was repaid prior to January 1, 1957. Petitioners accordingly now claim a bad debt for 1956 in the amount of $115,708.82, and not the full $164,000 deducted on their 1956 returns. When their returns for 1956 and 1957 were prepared it was erroneously thought that the foregoing $48,291.18 recoveries in 1956 as well as additional recoveries in 1957 in the net amount of $16,561.44 were all received in 1957, and the aggregate of such recoveries for both years, $64,852.62, was erroneously reported as income for 1957. The $164,000 debt from Stone to Loyd, as reduced to $115,708.82 in 1956, became worthless in 1956. Under the direction and supervision of Wesley Suman, Stone's accountant, two statements of net worth were prepared, one entitled "Thomas G. Stone and Janice M. Stone owned corporations - Statements of Net Worth on the basis of estimated fair market values of assets - April 30, 1957", and the other "Thomas G. Stone and Janet M. Stone - Statement of Net Worth on the basis of estimated fair market values of assets - April 30, 1957". [8] The statements represent a summary of the books of account of the various persons *303 referred to therein as adjusted to an estimate of fair market value of the assets shown therein. The first statement covers the assets, liabilities, and net worth (deficit) of the various Stone corporations, including S & S Homes, and their total assets, liabilities, and net worth (deficit) as of April 30, 1957. The consolidated figures shown in this statement for all of these corporations are as follows: Assets
Total
Cash in banks - unrestricted
$ 16,331.85
Cash in banks - restricted
227,892.23
Cash in banks - trust funds
17,654.60
Veterans First mortgage loans re-
ceivable - valued at 92
4,188,153.17
Real property held for sale - at
estimated realizable values
4,053,917.01
Fixed assets - net book value
29,026.01
Deposit - Telephone
500.00
Total
$8,533,474.87
Liabilities and Net Worth
Accounts payable - Trade
$ 102,530.17
Liquidating dividends payable
1,208.74
Notes payable to band - land and
construction
3,045,488.96
Notes payable to bank - commer-
cial
41,785.51
Hypothecation loans payable -
Bank
4,298,410.32
Notes payable - other
1,294,180.58
Accrued interest payable - Bank
155,547.77
Trust funds payable
18,710.54
Accrued payroll taxes
1,139.77
Due to (from) L. A. Morrow and
Affiliates - Net
100,060.82
Total
$9,059,063.18
Net worth (deficit)
(525,588.31)
Total
$8,533,474.87
*304 The assets, liabilities and net worth of S & S Homes as of April 30, 1957 are shown in the statement to be as follows: Assets
Cash in banks - unrestricted
$ 390.74
Cash in banks - trust funds
11,763.94
Veterans first mortgage loans re-
ceivable - valued at 92
$2,503,146.49
Fixed assets - net book value
5,198.30
Deposit - Telephone
500.00
Total
$2,520,999.47
Liabilities and Net Worth
Accounts payable - Trade
$ 16,214.13
Notes payable to bank - commer-
cial
22,473.94
Hypothecation loans payable -
Bank
2,504,531.37
Notes payable - Other
967.14
Accrued interest payable - Bank
18,478.02
Trust funds payable
11,763.94
Due to L. A. Morrow and Affili-
ates
122,527.53
Total
$2,696,956.07
Net Worth (deficit)
(175,956.60)
Total
$2,520,999.47
*305 The second statement shows the assets, liabilities, and net worth (deficit) of Stone and his wife, Janice M. Stone, as of April 30, 1957, to be as follows: Assets
Cash in Wells Fargo Bank - Mar-
gin Account
$371,669.48
Note receivable - Unsecured - A.
Kofman - $75,000.00 - Estimated
value
65,000.00
Partnership interest - Chambers
Lodge - at sales price in May
1957
75,000.00
Residence - Atherton, California -
Estimated fair market value
65,000.00
$576,669.48
Liabilities and Net Worth
Notes payable and accrued interest
thereon - Wells Fargo Bank
$107,680.61
Accrued interest owed Wells Fargo
Bank on loans guaranteed for
others
29,941.31
Payable to M. E. Heynes
10,000.00
Accrued 1957 U.S. and California
individual income taxes *
Excess of liabilities over assets of
corporations owned - Stones are
liable under guarantees
525,588.31
Note payable - L. A. Morrow - Net
before allowance for accrued in-
terest
137,787.60
$810,997.83
Net Worth (deficit)
(234,328.35)
$576,669.48
On July 28, 1960, two days before the statute of limitations would have run on the demand notes for $122,527.53 *306 and $164,000, dated August 1, 1956, Loyd caused complaints to be filed in the Stanislaus County Superior Court. In the complaints Loyd alleged that on May 27, 1959, he had demanded payment of the notes and that S & S Homes and Stone had failed and refused to pay any part thereof, and asked that judgment be entered for the amount of each note, plus interest, and costs. Neither complaint has ever been served because of inability to locate Stone. The Internal Revenue Service has not been able to collect income tax in the amount of $54,585.94, and interest thereon, assessed against Stone for the year 1957. The assessment was made on September 21, 1962. Opinion RAUM, Judge: These consolidated cases call for adjudication of the deductibility of two items as business bad debts, the first in the amount of $114,683.60 claimed in the Morrow Brothers partnership return for its fiscal year ending April 30, 1957, and the second in the net amount of $115,708.82 claimed in behalf of petitioner Loyd Morrow for the calendar year 1956. The Commissioner challenges these deductions on a variety of grounds, and we dispose preliminarily of his objection that neither of these alleged debts became worthless *307 during the taxable periods before us. The record contains considerable evidence relating to this issue, some supporting the Government and some supporting the petitioners; and while the matter may not be conclusively established, we are reasonably satisfied on the whole and so find as a fact that these debts became worthless prior to December 31, 1956, within Morrow Brothers' fiscal year ending April 30, 1957 and Loyd's calendar year 1956. Of course, the mere fact that the creditor might recoup some of the debt in a later year by the way of salvage does not prevent a finding of worthlessness as of the time when all reasonable expectation of recovery of the debt must be deemed to have vanished. We pass to a consideration of various other issues raised in respect of the two items before us. 1. The $114,683.60 item is a composite of a large number of entries in a so-called "current account" on the books of Morrow Brothers and allegedly represents the net amount owed to Morrow Brothers by S & S Homes as of April 30, 1957, after taking into account numerous loans or advances by Morrow Brothers allegedly for the benefit of S & S Homes and various repayments by or in behalf of S & S *308 Homes over the period September 10, 1953 through April 30, 1957. Morrow Brothers had no books during the first year and a half or two of this period, and the books containing this account were retroactively set up in 1955. The record is in considerable confusion as to many of the component entries in this account, and, bearing in mind petitioners' burden of proof, we cannot find that the net amount of $114,683.60 in its entirety represents business loans by Morrow Brothers to S & S Homes. Notwithstanding a diligent attempt to analyze this account, entry by entry, we cannot with any degree of confidence determine the nature of many of the constituent items. We are satisfied that some of them do reflect business loans by Morrow Brothers to S & S Homes, and, indeed, the Government has conceded on brief that $26,740.87 may be so classified. We are also satisfied either that some of the items are entirely unrelated to the business of Morrow Brothers or, in the very least, that there is no convicing evidence in petitioners' behalf pointing the other way. The matter cannot be determined with mathematical accuracy on the basis of the record before us, and doing the best we can with the materials *309 at hand we hereby find that $40,000 of the net debt of $114,683.60 represents a business bad debt deductible by the Morrow Brothers partnership for its fiscal year ending April 30, 1957. Cf. (C.A. 2); , affirmed (C.A. 4), certiorari denied, . 2. The $115,708.82 deduction claimed by Loyd A. Morrow individually as a business bad debt for 1956, represents the amount remaining as of December 31, 1956 on a loan of $164,000 made to Thomas G. Stone on July 27, 1955. The Commissioner challenges the deduction on several grounds. We hold that petitioner must prevail. (a) The Government argues that the $164,000 debt did not represent loans by Loyd but were loans made by the various corporations from which the funds were originally obtained. We are persuaded otherwise by the evidence. We are satisfied that Loyd borrowed the funds from the various sources, and indeed thereafter repaid the amounts involved to those corporations. The funds were his when they were obtained and he personally lent them to Stone. He was the creditor, and when *310 Stone's debt went sour it became Loyd's bad debt, not the bad debt of other entities. (b) The Government contends also that the $164,000 debt was not a business debt of Loyd, citing . The argument is that the loan to Stone was made for the purpose of acquiring control of Home Mutual Savings & Loan Association in order to facilitate the financing of the building construction operations, that such operations were then being conducted in corporate form, that such loan was for the benefit of the corporations rather than for Loyd's benefit individually, and that it therefore cannot be classified as a business loan by Loyd. We think that this contention takes too narrow a view of the record. Loyd was a builder and real estate developer. He had operated with his brother Raymond in partnership form, and in 1955 a number of corporations were established as vehicles to carry on his activities. He had no definite future plans as to how he would continue to engage in building activities or real estate development. He expected only that he would continue to be so engaged for the rest of his life. Of course, some of his profits would come from *311 dividends or enhancement in value of the stock of his corporations. But he had no intention of limiting his activities in that manner. In fact the record shows that he thereafter also became engaged personally, through joint ventures, in various real estate development projects. And if one were to assume, as appears reasonable, that his energies and attention were to be devoted exclusively to real estate development activities, he had a personal interest as employee or officer of the corporations involved in addition to that of a stockholder's or investor's interest in such corporations. Moreover, at the time of the $164,000 loan, Morrow Brothers, of which Loyd was an equal partner, was a creditor of S & S Homes, and Loyd had a reasonable personal business interest in having that debt repaid. The making of the $164,000 loan was for a purpose that would facilitate the repayment of that loan. We are satisfied that Loyd had substantial personal business reasons for making the $164,000 loan, wholly apart from his intention to benefit as a stockholder of his corporation, and "it suffices for deduction that the creation of the debt should have been significantly motivated by the taxpayer's *312 trade or business, even though there was a non-qualifying motivation as well". (C.A. 2), affirming . We hold that the $115,708.82 bad debt loss, which stemmed from the $164,000 loan, was a business bad debt and deductible as such by Loyd in 1956. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Loyd A. Morrow, Docket No. 3741-62; Zella E. Morrow, Docket No. 3742-62; and Loyd A. Morrow and Zella E. Morrow, Docket No. 3744-62.↩
2. This issue affects the Raymond Morrows by reason of a claimed carry-back to 1955, and it affects the Loyd Morrows not only as it relates to the 1957 deficiency determined against them but also to a claimed carry-back.↩
3. See footnotes 4 and 5, infra, as to ownership of stock in the corporations listed.↩
4. The Morrow corporations were Central Mortgage Discount Corporation, R-B Construction Co., KT Construction Co., Montforest Homes, Inc. (name changed to Morrow Homes, Inc.), Ceres Garden Homes, Inc., Overton Homes, Inc., Morrow Construction Co., Bear Creek Homes, Inc., Donner Trail Estates, Inc., Raymond Morrow Construction Co., Morrow Vista Homes, Inc., Nueva Vista Homes, Inc., Seneca Construction Co., Stone Manor Homes, Inc., Wayside Homes, Inc., and Moby Real Estate Co. ↩
5. The Stone corporations, as of April 30, 1957, included the following: S & S Homes, Inc., T. G. Stone Enterprises, Inc., Mountain Gardens Skyview Homes, Park Vista Homes, Stone Garden Homes, Inc., Stone McKinzey Corp., Brightlawn Homes, Inc., Home Mutual Loan Corp., H.M.A. Inc., Central Valley Development Co., National Homes, Inc., Holiday Manor, Inc., Stone & Miles, Inc., Manor Sales, Inc., Overton Homes, Inc.↩
*. These amounts represent construction loan moneys advanced by Wells Fargo Bank to various corporations owning land and by such corporations to the R.B. Construction Co. and K.T. Construction Co., the repayments of which were guaranteed by Stone and Loyd.↩
6. The numerous corporations owned or controlled by Stone were referred to as the "Stone empire."↩
7. According to the "current account," the amount owed by S & S Homes to Morrow Brothers as of June 30, 1956, was $122,527.53.↩
8. The parties have stipulated that the assets and liabilities shown on these statements as of April 30, 1957 are not substantially different from the assets and liabilities that were in existence on December 31, 1956. They have also stipulated that, except for liabilities on those statements which are specifically identified otherwise, substantially all of the liabilities of Stone and his wife and of their controlled corporations were owed to the Wells Fargo Bank.↩
*. No provision made for such taxes.↩